This is a suit upon an open account. Plaintiff's petition is as follows:
 "(1) That the said Trumbull is justly and legally indebted unto your petitioner in the lawful sum of $5,157.33 as a balance due on account, which was for goods, wares, merchandise, lumber (stave), bolts, freight, and other items sold and delivered as shown on the itemized account hereto attached and made part hereof; which account has heretofore been rendered to the said defendant and has not been disputed; and the said balance has not been paid, though often demanded.
 "(2) Wherefore petitioner prays," etc.
The answer to this petition was as follows:
 "Answering paragraph 1 of plaintiff's petition, he admits that he has purchased supplies from the Sabine Lumber Company, and that he has been furnished (stave) bolts by it on a contract had with it; but (avers) thathe has paid in full for all such supplies and bolts sofurnished him; and he especially denies that he is at this time indebted to the Sabine Lumber Company in any amount whatsoever." (Italics ours.)
And defendant then assumes the position of plaintiff in reconvention, and sets up a reconventional demand for $52,350; of which more hereafter.
The supplemental answer "adopts all the allegations of the original answer and reconventional demand," and then adds:
 "Further answering paragraph 1 of plaintiff's petition, defendant specially denies that *Page 623 
the account attached to plaintiff's petition has ever been rendered to him, and specially denies that payment thereof has ever been demanded of him, and specially avers that at various times he has requested and demanded of plaintiff that he be furnished with a complete statement of said account, but that plaintiff has refused and neglected to furnish such account."
 I.
As a plea of payment is inconsistent with the general issue, and admits the debt unless made good (Landry v. Delas, 25 La. Ann. 181), plaintiff might have rested there. But, since it makes no point of this, we proceed to examine the account, of which we have given two analyses hereto annexed as Exhibits A and B.
 II.
The evidence shows that defendant was duly furnished with the account sued upon; that he acknowledged the correctness thereof; that he promised to pay the same. At the same time, we think that defendant's examination of the account was carelessly and negligently made; and, as we find one gross error therein, we will correct it.
For the rest: Plaintiff and defendant went over the account together about the end of the month of June, 1919, and found that the balance against defendant amounted to $9,523.95 (i.e. $8,327.86 plus $1,196.09). The differences between them, except certain freight items, were then adjusted by defendant being allowed a credit of $759.40; and defendant thereupon paid $8,000 on account, leaving a balance of $764.55 still due.
The freight items, which remained unadjusted, amounted to $588.75. Deducting this from the balance aforesaid leaves a net
balance against defendant, on June 30, 1919, of $175.80.
This indebtedness had been incurred under a certain contract between the parties, entered into in August, 1918, which is the subject of the reconventional demand, and *Page 624 
of which we will say more hereafter; one of the features of that contract being that plaintiff was to furnish and deliver to defendant stave bolts at $13 per cord for red oak, and $15 per cord for white oak (average $14 per cord).
But on June 30th the parties modified their contract so that plaintiff was no longer to furnish the bolts, but defendant was himself to cut the same off plaintiff's lands, and plaintiff was to deliver them to defendant at $7.50 per cord for red oak, and $8.50 per cord for white oak (average $8 per cord). The evidence shows that during July and August defendant received 311.3 cords of mixed red and white oak bolts, which, at the average price of $8 per cord, amounts to $2,490.40.
The evidence further shows that during the months of July, August, September, and November, 1919, defendant's account at plaintiffs' commissary store amounted to $763.94 (i.e., $221.55; $207.15; $228.65; $106.59); against which he received a credit for five small houses amounting to $300, leaving a net balance of $463.94.
Adding $175.80, $2,490.40, and $463.94, we have a total balance in favor of plaintiff of $3,140.14, instead of $5,157.33 as claimed; and the judgment against defendant must be reduced accordingly.
 III.
The substance of defendant's claim in reconvention is (1) that plaintiff sold him all the oak timber on its 16,000 acres of land to be manufactured into barrel staves, and that he was deprived of the profits thereon by reason of plaintiff's breach of contract; and (2) that plaintiff agreed to deliver said timber at the rate of 40 cords per day, but failed to deliver as much as one-fourth that amount, whereby defendant lost certain sums which he had to pay out whilst his stave mill lay idle. *Page 625 
(1) The only evidence that plaintiff sold defendant all the oak timber on the land is defendant's own unsupported testimony to that effect. This is contradicted by the testimony of plaintiff's general manager of whom defendant claims to have made the purchase. Of course this testimony does not suffice to prove such a sale. Even if defendant's testimony stood uncontradicted, it would still not suffice to prove a contract involving more than $500. R.C.C. art. 2277. But the sale of standing timber, is, in this state, the sale of an immovable (Act 188 of 1904); and hence, unless the same be made in writing, the denial thereof by either one of the parties under oath, is conclusive even between the parties (R.C.C. arts. 2275, 2440). Finally, the fact that defendant of his own volition, ceased cutting the timber and moved away his mill, without so much as pretending to any one to be owner of said timber until this reconventional demand was filed, is a far better indication of what he conceived his rights to be than any testimony subsequently given.
(2) Defendant's testimony is that plaintiff agreed to deliver 40 cords per day; the testimony of plaintiff's general manager is that he was to supply defendant's mill with all the timber it could use. The evidence shows that the mill could use between 15 and 20 cords per day, working on a 10-hour shift, or double that amount when working on a double shift (night and day). But no double shift was in contemplation of the parties at the time the contract was entered into except as a possibility; for plaintiff bound itself to furnish and defendant bound himself to take only sufficient water to run one 10-hour shift, at $50 per month. Defendant was to pay $100 per month only if he ran a double shift. It is true that defendant had extra machinery and boilers on hand with which he might have increased the capacity of his mill, but these were never *Page 626 
installed. And the fact is that all this occurred whilst we were engaged in the great war, when every available man was being sent to the front, and hence defendant was unable to secure sufficient labor even to run his mill as it was.
Nevertheless defendant was able to handle some 15 or 20 cords per day with his mill as it stood.
In the voluminous and scattered testimony which comes up to us, it is difficult to pick out the facts as to what really occurred about the delivery of bolts; but it seems that deliveries were slow during October and November of 1918. And at this time defendant paid promptly for such bolts as he received. But in December, January, and February, deliveries became more rapid, plaintiff delivering practically all the bolts that defendant could use; and defendant immediately began to fall behind in his payments, the agreement having been that he should pay for the bolts at least every 30 days. Thus defendant's account grew month by month from November to the end of February, when it reached a total of over $14,000.
There had been some complaint about deliveries in October, but this had been remedied as aforesaid. However, when plaintiff began pressing defendant for payment of his account, then the latter began at once to complain about deliveries, which complaint was not at that time well founded.
Well, to make a long story short, since the course of the business may be traced in the exhibits hereto annexed, defendant continued to be slow in reducing his account, and deliveries began to fall off; until in June, as we have said, when the account was practically settled and new arrangements entered into between the parties.
Our conclusion is, and the annexed exhibits show, that defendant was not living up to his own part of the contract, which was *Page 627 
to pay for the bolts at the end of each month; and hence that defendant was not in a position to demand of plaintiff that it furnish him with more bolts, since he was not paying even for those which he received. Indeed, even after the new arrangements were entered into in June, as aforesaid, defendant still continued to default in his payments; in fact, after that date he did not so much as pay his commissary account.
The trial judge found that the reconventional *Page 628 
demand was without merit, and so do we.
 Decree.
The judgment appealed from is therefore amended so as to reduce the amount allowed plaintiff from $5,157.33 to $3,140.14, with 5 per cent. interest thereon from judicial demand until paid, and, as thus amended, said judgment is affirmed; plaintiff to pay the costs of this appeal, and defendant to pay the costs of the court below.
 Exhibit A. General Account Current. M.C. Trumbull in Account with Sabine Lumber Co.
August, 1918 ...... Debits, $ 790.52; credits, $ (none);
September, 1918 ...... Debits, 2,159.02; credits, 1,287.48;
October, 1918 ...... Debits, 262.20; credits, (none);
November, 1918 ...... Debits, 467.08; credits, 3,000.00;
December, 1918 ...... Debits, 7,973.21; credits, 5,000.00;
January, 1919 ...... Debits, 5,946.77; credits, (none);
February, 1919 ...... Debits, 6,711.96; credits, 1,000.00;
March, 1919 ...... Debits, 4,392.98; credits, 4,902.15;
April, 1919 ...... Debits, 3,862.16; credits, 5,963.33;
May, 1919 ...... Debits, 2,454.90; credits, 5,539.98;
June, 1919 ...... Debits, 1,196.09; credits, 8,759.40;
July, 1919 ...... Debits, 221.55; credits, (none);
August, 1919 ...... Debits, 4,634.99; credits, (none);
September, 1919 ...... Debits, 228.65; credits, 300.00;
November, 1919 ...... Debits, 106.59; credits, (none);
 ----------- -----------
 Totals ............. Debits, $41,408.67; credits, $35,752.54;
August, 1918 ..................... debit balance, $ 790.52
September, 1918 ..................... debit balance, 1,662.06
October, 1918 ..................... debit balance, 1,924.26
November, 1918 ..................... credit balance, 608.66
December, 1918 ..................... debit balance, 2,364.55
January, 1919 ..................... debit balance, 8,311.32
February, 1919 ..................... debit balance, 14,023.28
March, 1919 ..................... debit balance, 13,514.11
April, 1919 ..................... debit balance, 11,412.94
May, 1919 ..................... debit balance, 8,327.86
June, 1919 ..................... debit balance, 764.55
July, 1919 ..................... debit balance, 986.10
August, 1919 ..................... debit balance, 5,621.09
September, 1919 ..................... debit balance, 5,549.74
November, 1919 ..................... debit balance, 5,657.33
 ----------
 Totals ............................ debit balance, $5,657.33
 Credit allowance ................................. 500.00
 ----------
 Net Debit Balance ................................ $5,157.33

 Exhibit B Memorandum of Staves Furnished to M.C. Trumbull by Sabine Lumber Company, at $14 ($13-$15) per cord, Counting 25 Working Days per Month.
August, 1918 ........... Debits, $ 573.88, say 40.4 cords;
September, 1918 ........... Debits, 1,629.50, say 116.4 cords;
October, 1918 ........... Debits (none), say (none);
November, 1918 ........... Debits 457.71, say 32.7 cords;
December, 1918 ........... Debits 7,100.75, say 507.2 cords;
January, 1919 ........... Debits 4,495.30, say 321.1 cords;
February, 1919 ........... Debits 5,374.57, say 383.9 cords;
March, 1919 ........... Debits 4,030.63, say 287.9 cords;
April, 1919 ........... Debits 3,050.66, say 217.9 cords;
May, 1919 ........... Debits 2,156.05, say 154.0 cords;
June, 1919 ........... Debits 966.72, say 69.0 cords;
 ---------- -------
 Totals .................. Debits, $29,835.77, say 2,130.5 cords;
July, 1919 ........... Debits, (none), say (none);
August, 1919 ........... Debits, 4,427.84, say 311.3 cords;
 ---------- -------
 Totals .................. Debits, $34,263.61, say 2,441.8 cords;
August, 1918 .................... i.e., 1.6 cords per day.
September, 1918 .................... i.e., 4.7 cords per day.
October, 1918 .................... i.e., (none)
November, 1918 .................... i.e., 1.3 cords per day.
December, 1918 .................... i.e., 20.3 cords per day.
January, 1919 .................... i.e., 12.8 cords per day.
February, 1919 .................... i.e., 15.4 cords per day.
March, 1919 .................... i.e., 11.5 cords per day.
April, 1919 .................... i.e., 8.7 cords per day.
May, 1919 .................... i.e., 6.2 cords per day.
June, 1919 .................... i.e., 2.8 cords per day.
 ----
 Totals ........................... i.e., 7.8 cords per day.
July, 1919 .................... i.e., (none)
August, 1919 .................... i.e., 12.5 cords per day.
 Totals ........................... i.e., 6 cords per day.
 *Page 629